GARRISON, Judge.
This is an appeal from a judgment of the district court granted in accordance with a commissioner’s recommendation. The judgment dismisses Mable Herbez Maleig’s suit to declare a donation of immovable property made by her to her only surviving son, Calvin J. Maleig, as null and void under Louisiana Civil Code Article 1497. The judgment further dismisses her rule to increase parental alimony under Article 229 and her action to rescind the transfer of her automobile. From that judgment plaintiff appeals.
On November 16, 1971, the plaintiff, Mable Herbez Maleig, executed an act of credit sale before a notary public, wherein she transferred all of her interest in property situated at 8620 Chef Menteur Highway in the Parish of Orleans to the defendant, her son, Calvin J. Maleig, for k recited cash consideration of $106,516.68. The property in question consisted of eight double rental units, plus the former family home which plaintiff was occupying at the time of the transfer. After the date of transfer two additional units were constructed on the property.
In April, 1978, Mrs. Maleig filed suit to annul the transfer of the property to Calvin Maleig as a prohibited donation omnium bonorum, void under Article 1497. In addition, in a supplemental petition, she sought an accounting for or return of her 1973 Cadillac from the defendant, an accounting for rents collected by the defendant since 1975, and parental alimony from him in the amount of $400 per month because her total income now consisted of approximately $300 per month in Social Security and VA benefits:
Calvin Maleig filed an answer and affirmative defense alleging the following: that he provided materials, labor and services in the construction of improvements on the property and has actually paid sufficient legal consideration for the transfer of plaintiff’s title to the property; that the transfer of the property was suggested by his mother in return for his years of labor, time and efforts in the management of the rental units and in order to induce him to continue managing and maintaining the units; and that the above, together with the assumption of the mortgage on the property, constitutes a valid, binding salé or a legitimate remunerative donation. Alternatively, he alleged, the transfer was not a donation omnium bonorum because it did not constitute all of plaintiff’s property and assets so as to render her incapable of supporting herself.
In October, 1978, the district court signed a consent judgment for $200 per month in alimony. Defendant later answered plaintiff’s supplemental petition, stating that in the event the transfer to defendant should be nullified, he was entitled to a credit, reimbursement and accounting from plaintiff for the time, money and labor he expended on the construction and maintenance of improvements on the property, under a theory of quantum meruit.
Trial on the merits was held before a commissioner in November, 1979, and the case was taken under advisement. After the trial and before judgment was rendered, a rule to increase parental alimony was filed by Mrs. Maleig after she was placed in a rest home because of deteriorating health.
The commissioner’s report, which was eventually rendered in December, 1980, found that the transaction had been a valid remunerative donation and dismissed the suit to annul and the rule to increase paren *498 tal support. The trial court adopted the commissioner’s report without change and rendered judgment in March, 1981, dismissing Mable Maleig’s suit.
The specifications of error on which plaintiff has based her appeal may be consolidated into two issues. The first issue is whether the commissioner and district court erred in finding, first, that a remunerative donation under Article 1526 had taken place, and second, that the Article 1497 prohibition against donations omnium bono-rum is inapplicable to remunerative donations, and therefore making no finding as to whether the transfer was a donation omni-um bonorum. The second issue is whether the district court erred in failing to recognize plaintiff’s usufruct over the disputed property.
In order to make a proper determination of whether there was error by the trial court, we must first examine the pertinent facts surrounding the transaction and the law with regard to such' transfers.
Defendant Calvin Maleig is the only surviving son of Arnaud and Mable Maleig.[1] He began working at a brewery in 1942, at age fourteen, worked there approximately two years, and then began working as an apprentice plumber. During these years Calvin turned over his salary to his mother, who in turn gave him ten dollars a week. He lived with his parents during this time, until his marriage in 1948.
In March, 1946 Arnaud and Mable Maleig purchased the premises at 8620 Chef Ment-eur Highway in New Orleans for $8,000.00.[2] In October, 1950 they purchased the adjoining lot for $6,500.00. These two parcels are the subject of this litigation.
After the purchase of the first lot, Calvin and his father added a garage to the house. Calvin alone did all the plumbing and roofing work on the garage and shared the other construction duties with his father. A year later, his uncle constructed the first double on the property in the area behind the garage. Although his uncle did a majority of the work, Calvin assisted in the construction and performed all of the plumbing work on the building.
After the second lot was purchased, Calvin formulated a plan to build more doubles on both properties to increase the revenues. His idea was to build one double unit at a time, and as money was accumulated by the family, to continue with the construction of further units. His plan was met with stiff resistance from his parents. However, sometime in 1953 Calvin disregarded his parents’ wishes and cleared a building site while they were away from home. Although this act was originally met with animosity, his parents relented, and Calvin and his father and grandfather began constructing another double unit.
During this construction, other skilled journeymen were hired only where the work to be done was beyond the defendant’s expertise, such as electrical and sheet metal work. These journeymen were paid from accumulated revenue, and Calvin assisted in these instances as a helper, in order to reduce costs. By this time Calvin was a journeyman plumber.
In 1956 and 1957 two more double units were built, employing the same procedure as in the construction of the previous double. The defendant himself dug the foundation for the slabs, built the forms for pouring the slabs, put gas and water lines in place, dug space for and put into place the septic tank and bleeder lines, did all interior plumbing, and generally assisted the electricians, carpenters and roofers.
In 1958 the defendant’s father, Arnaud Maleig, died. Under his will Mable Maleig received two-thirds of her husband’s half of the community property such that Mable Maleig now owned five-sixths and Calvin Maleig owned one-sixth of the whole of the Chef Menteur property subject to a usu-fruct in favor of Mable Maleig.
*499 In 1959 and 1960, two more double units were built and the oldest double unit was moved to the rear of the lot. The defendant did his usual tasks of laying the foundation, installing all plumbing and assisting the roofers and electricians. Although the moving of the double was done by professionals, Calvin installed the new septic tank and ran gas and water lines.
An additional double was constructed in 1964, with Calvin performing the same tasks as before. By this time the- City of New Orleans had located sewer lines throughout the city, so Calvin unhooked all septic tanks on the property and ran sewer lines to every unit.
In addition to the new construction which the defendant had conceived, supervised and participated in, in about 1960 he assisted in the moving of the family home to the center of the property. Here again he dug space for the new foundation, prepared the forms, set the new water, gas and sewer lines and made all the house connections. He also demolished the old foundation.
The evidence indicates that besides supervising and assisting in all the above work, the defendant maintained the property over the years, doing whatever was necessary to maintain both the family home and the rental units. He assisted in bricking some of the older units; he removed all attic fans in the older units and replaced them with air-conditioning units; he did the original painting of all units and most of the painting thereafter; and he was responsible for such routine tasks as cutting the grass, maintaining the plumbing, and doing minor carpentry work. He was sometimes assisted in these tasks by friends or his son and his son’s friends.
With respect to the transfer of the property from plaintiff to defendant, the evidence reveals that the plaintiff discussed ■with various family members her intention to convey the property to her son and her reasons therefor, to-wit, that the property would not have been improved nor maintained had it not been for Calvin and that she wished to reward him for his labors over the years and relieve him of the costs of administration of a succession and of inheritance taxes. Her attorney subsequently conferred with both Mable and Calvin, and suggested a simulated act of sale, in which no money was to pass hands, as a way of transferring the property. The transfer was made on this basis in November, 1971.
After the transaction, as agreed between the parties, Mable Maleig continued to live in the family home and manage the rental property, collecting and using the rent as she always had, to pay both her own hills and expenses generated by the ongoing construction and maintenance of the complex. It was during this time that Mable used some of the revenues to purchase the 1973 Cadillac whose ownership was also in dispute. In all respects she appears to have had the use and benefit of the property. Calvin continued to maintain his residence with his wife at their home on San Marco Drive in New Orleans.
During this time the relationship between the mother and son was close-knit, Mable visiting Calvin’s family frequently and having dinner with them, accompanying them on family outings, and Calvin helping his mother with grocery shopping and errands, as well as the routine maintenance he continued to perform on the property.
This arrangement worked well for several years. Unfortunately, in about 1975 plaintiff began to experience the beginning of what her physician, Dr. Naccari, later diagnosed as arteriosclerosis of the cerebral vessels — in short, senility. Numerous family members testified to examples of plaintiff’s mental decline. She began forgetting to collect rents or attempting to collect twice from the same tenants; she repeatedly lost her way while driving to her grandson’s shop; she began to wander around the property at night, disturbing the tenants. On one occasion, she had to be rescued by police after driving in the wrong direction onto an interstate ramp.
Because of Mrs. Maleig’s unfortunate mental deterioration, Calvin Maleig and his wife in late 1975 took over the management of the property, collecting the rents them *500 selves and paying Mable’s telephone, utility and grocery bills. On the recommendation of Dr. Naccari, Calvin tried to discourage her from driving her automobile, which she eventually gave to her grandson, Calvin’s son, Alan.
As plaintiff’s mental condition further deteriorated, she developed a severe antagonism toward her son, which progressed to the degree that she accused him of stealing her money and stealing her car. She repeatedly had her telephone number changed and refused to give Calvin the number; she summoned the police on more than one occasion; and she tried to have her locks changed to prevent him from entering the house. Her mental state progressively deteriorated until in April, 1978, she filed the instant suit.
The facts as established above were presented by various family members and by Mable Maleig’s physician, all of whom testified at the request of the defendant. Mable Maleig was the only fact witness who testified for her cause and her testimony was unresponsive and generally incoherent. She was unable to offer positive testimony on her own behalf. Nor could she respond intelligently to cross-examination. Her- physician testified that at the time of trial she was in a state of advanced senility, which would manifest itself in total confusion as to times, dates and episodes. Therefore, the defendant’s evidence stands unre-futed.
Both plaintiff and defendant concede that the purported act of sale of the Chef Menteur property is a simulation and further admit that it is in actuality a donation. Because this donation of immovable property was passed before a notary and two witnesses, the necessary formalities of such a donation have been complied with. La. C.C. Article 1536. Therefore, the transaction is valid in form as a donation inter vivos.
It is not the form of the donation, however, that is disputed. Rather, the parties dispute the character of the donation under Article 1523:
There are three kinds of donations inter vivos:
The donation purely gratuitous, or that which is made without condition and merely from liberality;
The onerous donation, or that which is burdened with charges imposed on the donee;
The remunerative donation, or that the object of which is to recompense for services rendered.
Plaintiff Mable Maleig contends that the donation to her son was purely gratuitous, in order that he be relieved of future inheritance taxes. Defendant, on the other hand, asserts that the donation was made in remuneration for his years of continuous effort in maintaining the property. In light of the evidence presented and outlined above, we can reach no other conclusion than that the trial court was correct in finding that the donation was remunerative.
Plaintiff also contends that regardless of the character of the donation, a donation inter vivos is subject to the prohibition against donations omnium bonorum set forth in Article 1497:
Art. 1497. Nullity of donation inter vi-vos of entire patrimony
A. The donation inter vivos shall in no case divest the donor of all of his property; he must reserve to himself enough for subsistence. If he does not do it, a donation of a movable is null for the whole unless the donee, as to such immovable, has alienated by onerous title the immovable given to him. Except as provided in paragraph B hereof, if a donee has alienated by onerous title the immovable which has been given to him, the donation of such immovable shall not be declared null on the ground that the donor did not reserve to himself enough for his subsistence; however, the donee is bound to return the value that the immovable had at the time of its donation to the donee.
B. The provisions of this article are hereby made retroactive to any donation inter vivos made prior to September 10, *501 1982. Any person whose rights are adversely affected under the provisions of this article and whose rights have not prescribed or otherwise been extinguished or or barred on September 10, 1982 shall have one year from that date to initiate an action or proceeding to declare null a donation inter vivos as provided herein or be forever barred from exercising such right or cause of action.
Article 1497, however, does not stand by itself; it is defined and refined by other codal provisions:
Art. 1525. Remunerative donation
The remunerative donation is not a real donation, if the value of the services to be recompensed thereby being appreciated in money, should be little inferior to that of the gift.
Art. 1526. Onerous and remunerative donations, when rules applicable
In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services.
Article 1526 obviously creates exceptions to Article 1497 for valid remunerative donations because if the services rendered are of sufficient value, the remunerative donation is not a real donation at all. It might more properly be referred to as a remunerative transfer. In such cases, the Louisiana Supreme Court has stated that where the rules peculiar to donations inter vivos are not applicable, such transfers “are treated as onerous contracts, and are governed by the different rules applicable to them.” Garcia v. Dulcich, 237 La. 359, 111 So.2d 309 (La.1969).
The Louisiana Supreme Court interpreted Article 1526 and applied its formula in Whitman v. Whitman, 206 La. 1, 18 So.2d 633 (La.1944), where it held that Article 1526 exempts remunerative donations from the application of the Article 1497 prohibition against donating all of one’s property. In Whitman, the court found a donation of immovable property by a brother and sister to their youngest brother to be partly onerous and partly remunerative. Although plaintiff is correct in pointing out that the court specifically found that the donors had not divested themselves of all their property, the court’s ruling that the donation would be upheld was primarily based on a different reason. The court explained:
“There is another reason, however, why article 1497 of the Civil Code is not applicable to the donation in contest in this case; that is, that the donation was an onerous donation, and to some extent a remunerative donation, and there is no proof that the value of the property donated exceeded by one-half the value of the services rendered by the donee. Article 1526 of the Civil Code provides that ‘the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object exceeds by one-half that of the charges or of the services.’ There is no proof in this ease that the value of the property donation exceeded [that amount].” 18 So.2d at 638.
Appellate decisions since Whitman have followed its pronouncements. (See Succession of Dickens v. Huey, 217 So.2d 228 (La.App. 2nd Cir.1968); Manuel v. Hebert, 236 So.2d 880 (La.App. 3rd Cir.1979); Kinney v. Kinney, 150 So.2d 671 (La.App. 3rd Cir.1963).
Plaintiff has cited one case, Lemoine v. Lemoine, 27 So.2d 650 (La.App. 2nd Cir. 1946), which is contrary to the holding in Whitman. In Lemoine the Second Circuit does hold that Article 1526 has no reference to Article 1497. However, the court gives no reason to support its opinion and makes no mention of the earlier Supreme Court decision in Whitman; nor has the case been cited by any Louisiana appellate court since its rendition. We believe that the interpretation enunciated in Whitman is controlling and we follow that interpretation.
We conclude that, because Article 1497 is a rule peculiar to donations, it will not apply to a remunerative donation unless the value of the property donated exceeds by one-half that of the services performed by the donee.
*502 Given the above analysis, the next step is to determine whether the donation from Mable Maleig to Calvin Maleig in fact meets the test of Article 1526. If the value of the Chef Menteur property at the time of the transfer in 1971 does not exceed by one-half the value of Calvin’s services over the twenty-year period, then Article 1497 will not apply to the situation before us.
This, however, is a matter of proof. Clearly, the donee must prove he has rendered the services before a remunerative donation can be found. Succ. of Formby, 243 La. 120, 142 So.2d 157 (1962); Almond v. Adams, 221 La. 234, 59 So.2d 132 (1952); Winbarg v. Winbarg, 177 La. 1071, 150 So. 21 (1933). We believe the defendant has conclusively proved that he performed services for his mother which were valuable and appreciable in money, and has also proved the extent of those services, which went far beyond the gratuitous services ordinarily expected to be performed by a child for his parents, from the time the lots were purchased and construction began to the time the transfer-was effected, and afterward.
Once the donee has proved the services have been rendered, however, the burden of proving that the test of Article 1526 has not been met is on the party attacking the donation. Placid Oil v. Frazier, 126 So.2d 800 (La.App. 2nd Cir.1961); Bowlus v. Whatley, 129 La. 509, 56 So. 423 (1911); Hearsey v. Craig, 126 La. 824, 53 So. 17 (1910); Fenger v. Cagnolatti, 292 So.2d 901 (La.App. 4th Cir.1974). We do not believe the plaintiff has met that burden. The plaintiff attempted to prove the value of the disputed property through the testimony of an appraiser, who estimated its value in 1971 at $240,000. This estimate, however, was inaccurate because it included all improvements on the property, not just those in existence at the time of the transfer. The commissioner, after making certain adjustments, accepted the value of Mable Maleig’s interest in the immovable property in 1971 to be $160,000.
Plaintiff offered no evidence, however, to prove the value of her son’s services to her. Mrs. Maleig herself was unable to present any coherent testimony with regard to the services Calvin rendered, nor was her counsel able to achieve that end by cross-examination of defense witnesses. Although the defendant admitted that he would be unable to place a value on his services, it was not incumbent on him to do so.
Because plaintiff, as the party alleging the invalidity of the transaction, has not proved that the donation did not meet the test of Article 1526, the question of whether Mrs. Maleig divested herself of all her property is not relevant to the situation before us; we conclude that Article 1497 does not apply to the remunerative donation from Mable Maleig to Calvin Maleig. Consequently, the 1971 donation of the Chef Menteur property was a valid remunerative transfer, which we will uphold.
With respect to the issue of whether the plaintiff, in fact, reserved a usufruct of the Chef Menteur property, the record reveals that the act which transferred the property specifically provided that plaintiff was transferring “... all of the undivided right, title and interest of vendor herein including but not limited to her right of usufruct over the undivided interest of purchaser herein .... ” (Emphasis supplied). Louisiana Civil Code Article 1945 provides that the agreement must be interpreted according to the true intent of the parties. That intent, however, is to be determined by the language contained in the contract, when that language is clear and explicit. We believe that the above quoted provision of the agreement between plaintiff and defendant explicitly transfers and conveys plaintiff’s usufruct of the property. Therefore, although the testimony indicates that the parties intended that Mrs. Maleig continue to live on the property and collect the revenues, this relationship was not based on any enforceable legal relationship. In fact, the testimony clearly shows that Mrs. Ma-leig was made aware prior to the transaction that, under the terms of the sale, she no longer had a legal right to remain on the property and collect the rents, and she knew there was no assurance that her son would not make her leave the property nor *503 transfer the property from the Maleig interest at a later date. This negates the possibility of the parties’ intent to reserve to plaintiff a conventional usufruct of the property.
We conclude that plaintiff’s remaining on the disputed property and managing the rental units after the transfer of ownership did not constitute a reservation of usufruct such as would be legally enforceable. Therefore, the trial judge did not err in failing to recognize such a usufruct.
Accordingly, the judgment of the district court is affirmed.
AFFIRMED.

. Another son, Arnaud, Jr., died in 1944.

. The defendant contended that the litigated property was originally purchased with the money he gave his mother; however, copies of the defendant’s available tax returns introduced at trial indicate that his total income was $627 in 1942, $758 in 1944 and $1,470 in 1945.